IDLER et al. v. BORGMEYER.

(Circuit Court of Appeals, Third Circuit. January 22, 1895.)

No. 3.

1. CONTRACTS—INTERPRETATION—AWARDS BY VENEZUELAN MIXED COMMISSIONS.
    Between 1817 and 1821, one I. furnished supplies to the government of Venezuela. Payment therefor not having been made, I. went to Venezuela to collect the debt, and in 1832 secured a judgment in a court of Venezuela, against the government, for $70,520. On September 25, 1832, I. entered into a written contract with one C., whereby, in consideration of services rendered in procuring said judgment, I. agreed to pay C. 10 per cent. of the amount of his claim on the government of Venezuela "as soon as the payment or satisfaction is realized, in virtue of the judgment." Appeals were taken by the government of Venezuela from the judgment, but the same was affirmed. Subsequently, however, by a proceeding known as "restitutio in integrum," the government obtained the vacation of the judgment, and caused the matter to be restored to the position in which it was before such judgment was entered. Failing to obtain payment from Venezuela, I., and others having claims against that country, sought the intervention of the United States government, and in 1866 a convention was concluded between the United States and Venezuela, under which the claim of I., with others, was submitted to a mixed commission, authorized to

make such decision "as they should deem conformable to justice." The commission awarded to I. the amount fixed by the judgment of the Venezuelan court, with interest, and, in pursuance of such award, certain payments on account were made in 1871 and 1876. Both Venezuela and certain citizens of the United States being dissatisfied with the proceedings of this commission, a new treaty was concluded in 1885, providing for a new commission, also authorized to decide "as they should deem conformable to justice," which commission made the same award to the representatives of I. as the first commission, deducting the payments on account, and further payments were afterwards made on this award. The representatives of C. claimed the 10 per cent. commission on the payments made to I. *Held*, that the payments agreed to be made to C. were contingent upon I.'s recovering satisfaction for his judgment against Venezuela; that such satisfaction was never realized, the government of the United States not having attempted to collect the judgment, but its intervention having been strictly diplomatic and peaceful, the awards of the commissions having been made, independently of the judgment, upon the merits of the claim, and not at all in consequence of C.'s services; and that the 10 per cent. agreed to be paid to C. never became due, under the terms of the contract.

2. Payment—Presumption after Twenty Years.

Shortly after the execution of the first contract, I. also made a second contract with C., by public record, according to the law of Venezuela, whereby he acknowledged himself indebted to C. in the sum of $4,400, for moneys advanced by C., and agreed to pay the same from the first funds paid him by the government of Venezuela, to which C., by the same instrument, assented, and agreed to wait. C. died in 1836, and his heir, under the law of Venezuela, immediately succeeded to all his property, with the right to demand, sue for, collect, and recover all claims due him. I. died in 1856, and his estate was duly administered. No claim was made on behalf of C. until 1892, when letters of administration were taken out in Pennsylvania, and suit brought upon the contract. *Held* that, even assuming that the evidence presented did not prove payment of the debt, in fact, as it appeared to do, the debt would be presumed to be paid, since for more than 20 years there had been a person entitled to demand and receive it, who might have taken out administration if he so desired, and, even if C.'s agreement to wait bound him for more than a reasonable time or after the vacation of I.'s judgment against Venezuela, more than 20 years had elapsed since the first payment, in 1871, which, according to the claim of C.'s representatives, was a payment upon the judgment.

In Error to the Circuit Court of the United States for the Eastern District of Pennsylvania.

This was an action by Charles L. Borgmeyer, administrator of the estate of Alexander Chataing, deceased, against William Idler and John W. Haseltine, administrator de bonis non of Jacob Idler, deceased, upon two contracts, made in 1832 and 1833. Judgment was rendered in the circuit court in favor of the plaintiff, this court (BUTLER, District Judge), filing (March 6, 1894) the following opinion:

On the trial it appeared that between 1817 and 1820 Jacob Idler of Philadelphia and certain associates furnished Venezuela, then engaged in war, with various military supplies, on account of which she became their debtor in a large sum of money. After peace had been declared Mr. Idler, on his own account and as agent for his associates, proceeded to collect the amount due. Encountering difficulties, he placed the business in the hands of Alexander Chataing a reputable citizen of Caracas. After great labor and extended litigation Mr. Chataing succeeded, on September 18, 1832, in obtaining a judgment in Mr. Idler's name for $70,520.11. In the meantime Mr. Chataing had furnished Mr. Idler a large sum of money to enable him to live in Venezuela (where he had gone to assist about the business) and to carry on the litigation.

A few days after the judgment was obtained (September 25, 1832) Mr. Idler entered into the following obligation of record with Mr. Chataing.

"[Seal. Fifth seal for the economic year 1832–1833; value, a real.]

"Be it known by this document, that I bind myself to pay to Senor Alexander Chataing, as well on my own account as upon that of my absent associates, a commission of ten per cent. upon the amount of the payment that I am claiming from the government of Venezuela on account of supplies that I made to the aforesaid government in the years 1817 to 1820, as soon as the payment or satisfaction is realized which the aforesaid government has to make me in virtue of a judgment of the Senor 'Juez de Letras' issued on the 18th of the current month. I declare that the aforesaid commission of ten per cent. has been well merited and gained by Senor Alexander Chataing, on account of the assistance that he has given me during the prolonged suit which he has pursued against the government, and on account of the numerous acts of diligence, which he has performed to that purpose; and in conclusion, on account of the entire direction which he has given to the matter, although no publicly given power has authorized him, since he has discharged exactly, and with my consent in all details, the matter referred to, as an honest and careful attorney. For which reason I give him the aforesaid commission of ten per cent. upon the whole amount that the government has to pay me; i. e. as well upon the principal as upon the interest that I claim from the state. I will make payment of the aforesaid commission of ten per cent. in the same way that the government makes it to me, that is to say, if it makes it to me by installments in metal I will pay the commission as well in metal by installments, in pro rata of the sum that I receive at each installment; and if the government makes me the payment in treasury notes or bonds for the whole amount, or whatever other nature in the same way I will make payment of the aforesaid commission in the same specie or form of treasury notes or bonds. I desire that this document shall have the same force as if it had been a public writing, and renounce all laws that could favor me; in virtue of which I sign the present document in the presence of three witnesses.

"Caracas, September 25, 1832.          Jacob Idler.

"(The words 'ano' amended. Vale.)

"Witness: Franco Ribas.

"Witness: J. N. Zeresa.

"Witness: Cipriano Morales."

On January 9, 1833, Mr. Idler entered into a second obligation of record with Mr. Chataing in the following terms:

"[Seal. Fifth seal for the economic year 1852–1853; value, two reals.]

"I, Colonel Andres Ybarra, principal registrar of the province, certify: That in the registry of public instruments kept by the Escribano Juan Antonio Hernandez, appears a writing of the following tenor:

"'Obligation: In the city of Caracas, on the ninth of January, 1833, before me the escribano publico and witnesses, appeared Senor Jacob Idler, of this vicinity, and over twenty-five years of age, whom I certify that I know, and exhibited to me a ticket of the following tenor:

"'"Treasury General of Venezuela: Ticket No. 18:—January 9th, 1833: For 20 reals which Senor Alexander Chataing has paid, registry fee, due for 4,000 pesos which Senor Jacob Idler owes to him and promises to pay by a writing agreed to by himself before the Escribano Antonio Hernandez: two pesos four reals:—(Copy of an entry made upon folio 2 of the memorandum book of this month.)

"'"Caracas, date as above.

"'"[Signed]          Lecuna Smith."

"'—As literally appears by the original which remains in the record office in my charge, which I refer to, and certify.

"'Whereupon he said: That he acknowledges that he owes to Senor Alexander Chataing, also a neighbor, and of the "commercio," the amount of 4,400 pesos, of eight reals of silver each, which in coined and current money of account to his satisfaction the latter has furnished him, since the 24th of September, 1831, for expenses of his subsistence, and costs of the prolix and expensive suit pursued against the government of Venezuela in compensation for supplies made in the years 1817, 1820, in virtue of a contract made for him

self and his absent associates, and, granting to him proper receipt with renunciation of the laws of delivery, exception of non numerata pecunia, proof, etc., of the case,—obliges himself to satisfy it executively, with costs, from the first funds that may be paid him by the government, his debtor,—with his person and estate, present and future, judicial power; submission to this in order that it may compel and constrain him executively to its fulfillment, as if it was by judgment given by consent and passed as a thing adjudged authoritatively, and making hereby renunciation of all laws, statutes and rights in his favor, although it be one that may be propitious and afford a valid exception. The creditor, whom also I certify that I know, being informed of the literal contents of this writing, said that he accepts it according to law, and agrees to wait. Thus respectively have said, granted, and signed,—Senores Luis Apesteguia, Manuel Galloso and Lorenzo Callett of this vicinity (being witnesses), Jacob Idler, Alex. Chataing.

" 'Before me, Juan Antonio Hernandez, Escribano Publico.' "

When Mr. Idler demanded payment of his judgment Venezuela procrastinated; and eventually denied liability and sought to rid herself of the judgment.

Failing to accomplish the latter by an appeal to the supreme court (where the judgment was affirmed) she resorted to a proceeding known in that country as the "remedy of restitutio in integrum", which, if not obsolete at the time, was clearly inapplicable to the case, and by this means, and a reorganization of the courts to suit her purposes, she obtained what purported, and was intended, to be a nullification of the judgment.

In the meantime Mr. Idler, in despair of obtaining redress at the hands of Venezuela or her courts had returned to Philadelphia, and in conjunction with other persons having claims against Venezuela, sought the aid of his own government in the enforcement of his and their rights. After the lapse of many years (in 1867) a treaty was signed between the United States and Venezuela, whereby commissioners were appointed to examine and settle these claims. The commission sat at Caracas, and in 1868 made an award which sustained the claim of Idler and his original associates,—taking the judgment of 1832 as the basis of the claim, treating it (the judgment) as valid and binding—adding interest thereto, and awarding accordingly the sum of $252,814.

Under this award Venezuela, on June 21, 1871, paid $17,696.93. She was dissatisfied, however, with the result of the commission, and sought to escape it. In 1873 the congress of the United States declared the award final. Following this (May 16, 1876) she paid a further sum of $20,224.27. She continued, however, to express dissatisfaction and in 1878 congress repealed the statute of two years previous, declaring it to be without prejudice to the rights of the claimants under the previous award. The president of the United States continued to press for payment of the award; and in 1889 another treaty was entered into with Venezuela, whereby a second commission was appointed, which met at Washington in 1890.

After a very full and protracted hearing, this commission also sustained the claim of Idler and his original associates, taking the judgment of 1832, which it held to be valid and binding, as its basis, adding interest, as the former commission had, and crediting the payments made under the former award. In pursuance of this second award, $48,374.60 were paid October 15, 1890, and $20,330.64 January 23, 1892.

The record of proceedings before the commissions, as well as numerous other papers and documents connected with the claim, and the litigation thereon, are in evidence, and exhibit many facts, of more or less importance, not embraced in the foregoing statement, some of which will be referred to hereafter.

The plaintiff sues on the two obligations given Mr. Chataing (who died in 1836,) to recover the amount due from the several sums recovered from Venezuela.

The defendants requested the court to charge as follows:

"Fourth. The construction of the contract for compensation is for the court. It was not in contemplation of the parties to that contract that Chataing should receive compensation for an award made by an international tribunal many years after his death, presented and prosecuted by other agents and

attorneys. Venezuela having declined and refused payment, there can be no recovery based upon any award made in Caracas in 1868 or in Washington in 1890 (Pemberton v. Lockett, 21 How. 257); and the verdict under all the evidence must be for the defendant."

"Sixth. The undisputed evidence in this case is that no payments have been made by the government of Venezuela on account of the judgment rendered against it and which is set forth in said Exhibit B of plaintiff's statement, and therefore the verdict should be for the defendant.

"Seventh. The undisputed evidence in this case is that no payments have ever been made by the government of Venezuela on account of the original judgment or sentence of her courts, and she has uniformly refused and resisted payments of it for more than fifty years past; therefore no obligation to make payment has accrued under Exhibit B of the plaintiff's statement in this action, and the verdict should be for the defendant.

"Eighth. The effect of the treaties between the government of the United States and Venezuela on the Idler claim was to nullify and set aside the judgment referred to in Exhibit B. and remit the claimants to their original claims, subject to all just and equitable defenses.

"Ninth. The award in favor of Idler and his associates was made by an international commission administering justice and equity, for the supplies, etc., furnished by them to that government, and was a sentence or award, after full examination of the merits of the claim, irrespective of the original sentence of the Venezuela court.

"Tenth. By the decree of restitutio in integrum the judgment in favor of Idler and his associates was annulled in Venezuela. More than fifty years afterwards an international tribunal made an award to these parties, and the moneys they received were based on that award, and there can be no recovery in this suit."

"Twelfth. Upon the whole evidence the verdict should be for the defendant."

Counsel agreeing that the questions involved were for the court alone, the jury was directed to find for the plaintiff in the amount of his claim—the defendants' points requesting a different direction being reserved. Subsequently the defendants took a rule for judgment notwithstanding the verdict, and also a rule for new trial—which rules are now under consideration. Each will be disposed of in its order.

To answer the points separately is unnecessary. A sufficient answer to each will be found in the following discussion of the case.

The first matter for consideration is: What is the proper construction of the earlier of the two obligations sued upon? This obligation is in substance for the payment of 10 per cent. of the judgment obtained by Idler, when satisfaction is realized upon it. He is to be paid from this source alone. Although the consideration is stated to be past services of great merit, he cannot recover anything if nothing is realized from this source. The language of the obligation is unequivocal, and we are not at liberty to speculate about the meaning of the parties; we must find it in what they have said. Chataing chose to accept, as satisfaction for his services, the stipulated percentage of what might be collected on the judgment; and Idler obliged himself to pay this amount, in this manner. The former did not undertake to collect the judgment. The parties, of course, contemplated its payment; and probably supposed it would be soon, and without further litigation. This supposition is however, unimportant. The duty of collecting it was on Idler. If the trouble and expense was greater than had been contemplated it concerned him alone. His obligation is, in terms, unconditional and absolute; and no condition can be read into it by conjecture. If he desired such condition he should have required it. Chataing would then have been at liberty to accept the obligation, or to reject it and demand immediate payment of the debt—which was overdue. Why should he not, under such circumstances, have demanded immediate payment? The consent to await collection of the judgment seems very liberal; why should he suffer from Idler's subsequent misfortune? A different view would deprive him of a right to recover anything on a debt which Idler acknowledged to be due and highly meritorious, if the latter should incur labor and expense in recovering his money—would attribute to him the folly of agreeing to abandon his debt if Idler should encounter this misfortune.

The case bears no material resemblance to Pemberton v. Lockett, 21 How. 257, cited by the defendants, where the contract was, mainly, for future services, the performance of which became impossible because of a total change of circumstances, as stated by the court in that case. Bachman v. Lawson, 109 U. S. 659 [3 Sup. Ct. 479], is nearer in point.

The second question is: Was the money which has been received collected on this judgment? It is unimportant how Venezuela considered this; how should it be considered as between Chataing and Idler? In entering upon this inquiry it must be remembered that the judgment could not be collected by ordinary execution. Satisfaction could only be obtained through voluntary payment by the debtor, or the intervention of the creditor's government. Venezuela refused to pay, and the creditor's government intervened and collected the money. Was it collected on the judgment? Substantially it was. A full examination of the evidence leaves no doubt of this. At all times, from the rendition of the judgment in 1832, until the award of the last commission, the contention of Idler's administrators and his counsel, has been that the proceeding restitutio in integrum was illegal and void, that the judgment was unimpeached, valid and conclusive, and that Venezuela should pay accordingly. Before the first, as well as the second, commission, this was Idler's position. From the time his government intervened to aid him, this was its attitude. On the one side the effort was to sustain and collect the judgment, and on the other to show that it no longer existed. So the respective commissions regarded the controversy; and finding the judgment alive and valid, they awarded the amount of its face, $70,520, with interest added to date. The opinions filed by Mr. Talmage, the United States commissioner, and Mr. Machado, the umpire, of the first commission, show these facts (so far as they relate to that commission) with such distinctness and clearness that I am constrained to annex copies of them to this opinion.[1]

In 1889, when preparing to appear before the second commission, Idler's administrators and his counsel prepared a statement of his case, in the form of a petition, in which, after giving a history of the claim and the litigation upon it, asserting the binding and conclusive force of the judgment of 1832, they state the petitioner's attitude before the first commission, and the conclusions of that commission, as well as his attitude before the second commission, as follows:

"The claim of your petitioner's intestate was duly presented on or about the 29th of April, 1868, to the mixed commission which was organized at Caracas under the aforesaid treaty of April 25, 1866, between the United States and Venezuela, and that the administratrix of his estate claimed for and on account of the aforesaid judgment of the supreme court of Venezuela and the previous judgments of the courts below, confirmed thereby, the sum of $70,529.11½, awarded by the aforesaid final arbitrator, Jose Cadenas, with interest thereon at the rate of six per cent. per annum from June 30th, 1825 (to which date interest at that rate had been included in said award), until the 1st day of October, 1832, when the said award was confirmed by the said superior court at Caracas, amounting at that time, principal and interest, to the sum of $101,-209.28, and interest thereon at the rate of six per cent. per annum from October 1, 1868, the date of the decision of the umpire of the said mixed commission, amounting to $217,509.95, and making in all the sum of $318,809.23; that, upon the disagreement of the commissioners, the said claim was referred to the umpire of the said mixed commission, who made an award in favor of your petitioner's intestate in the sum of $252,314; that the said umpire, instead of calculating interest on the aforesaid award of Jose Cadenas to the date of its confirmation by the aforesaid superior court, and then calculating interest on the sum total due upon that judgment, calculated simple interest from June 30, 1825, at the rate of six per cent. per annum, on the amount awarded by the said Cadenas, to the date of his own award, thus giving the Venezuelan government an undue advantage of more than $65,000."

The counsel who appeared for the United States before the second commission (Mr. Ashton) commences his statement of the Idler claim in these words: "The claim in this case originated in four contracts made between Jacob Idler, a citizen of the United States, and the Venezuela government in and prior to

[1] See note at end of case.

the year 1820, and is based upon a judgment of the supreme court of Caracas rendered on the 1st of October, 1832, in favor of Idler, affirming a judgment of the jury de letras de hacendi (treasury court) entered September 18, 1832, upon an award made in his favor by Jose Cadenas at Caracas on the 11th of September, 1832."

The brief throughout is consistent with this statement—the source and foundation of the claim being the judgment of 1832.

The opinion of this commission was delivered by Mr. Little and is found at page 155 to 194 of its records. He starts out with a statement of the questions involved, as follows: "How far is the judgment of 1832 to be accepted as binding in the proceeding before us? Was the court organized for the Idler case, (the court that applied the restitutio in integrum remedy) in 1836 a legal body? If not, were its proceedings valid? Did the remedy restitutio in integrum pertain to Venezuela as respects the Idler case? If so did the proper court obtain jurisdiction in the premises? Was the general effect of the proceedings in 1836–39 a denial of justice? If so should the judgment of 1832 be allowed to stand?" After these questions are considered at great length they are answered in favor of Idler, the restitutio in integrum proceedings held to be unlawful and void—the judgment to be valid and binding upon Venezuela, the opinion terminating as follows: "Our conclusion from the foregoing considerations is that the proceedings in restitutio were, as against Idler, and are against the claimant, a nullity. This is the best we can say of them. The judgment of 1832, standing as it does, unaffected by the subsequent proceedings, must be sustained unless manifestly wrong." He then examines it on other objections raised, in which he finds no substance, and concludes as follows: "An entry can be prepared, allowing the claimant the amount of the judgment. $70,520, omitting the odd cents, with six per cent. interest, that being the rate named in the contracts, from October 1, 1832 (when the judgment was affirmed by the supreme court) to September 2, 1890, inclusive, less the deductions on account of payments made on the former awards. The same to be distributed as per agreement on file dated March 17, 1863." A decree was prepared and entered accordingly.

In view of these facts I can entertain no doubt that the money collected must be regarded as realized on the judgment; the fruits of its execution by the government of the United States.

The third question is: What is the proper construction of the second obligation? This presents no difficulty. The undertaking is, in effect, for the payment of 4,400 pesos "from the first funds that may be paid him (Idler) by the government of Venezuela, his debtor," in consideration of money theretofore furnished him for his support in Venezuela, and to enable him to prosecute his claim against that country. And as the obligation states, Mr. Idler "accepted it for his debt and agreed to wait."

Here no question arises respecting the right to payment from the money received,—unless the claim is subject to some other defense. Like the earlier obligation, it was not due, however, until money was received from Venezuela in 1871, and no interest is therefore recoverable on it prior to that date. It was an obligation to pay a sum certain on the happening of a described event, and the payment of this sum when the event occurred would have discharged it.

It follows from what has been said that judgment cannot be entered for the defendants in pursuance of their points.

Should a new trial be granted? It is asked for on the ground of after-discovered evidence, and an excessive estimate of the amount due. As respects the first there is no room for difficulty. There is no after-discovered testimony that should not have been previously discovered, if wanted. This is all I need say on that subject; but it may not be improper to add that I am not satisfied that the evidence referred to would be material if heard.

The second ground involves several considerations. I do not find any evidence of payments on account, beyond the plaintiff's credits.

The statute of limitation does not apply, inasmuch as there was no administration on Chataing's estate until recently, and there was no one, therefore, to receive the money or sue for it. Marsteller v. Marsteller, 93 Pa. St. 350.

Nor did a presumption of payment run as respects the proportion claimed of the money received in 1871, for the same reason. There was no one who had a

right to demand it—no one to whom it could lawfully be paid. It may be said that Chataing's heirs could have qualified themselves to receive, and to sue for it. But such an argument applies with equal force to the plea of the statute, in such cases. It is wholly illogical to say that the presumption of payment runs under such circumstances, and that the statute, which is founded on the presumption (and applied to simple contract debts) does not. The defendant cites and relies on Foulk v. Brown, 2 Watts, 215. A careful examination of this case shows that the court there concedes that under ordinary circumstances, the absence of administration precludes the presumption of payment, and puts the decision on the ground, distinctly and exclusively, that while the plaintiff (the decedent's husband) could not sue without administering, he was absolute owner of the claim, had complete authority to receive it and to enforce payment, during his wife's lifetime, and that therefore the presumption ran against him. The administration after her death was necessary only to meet a legal technicality. The money was his unconditionally. It was not applicable to the decedent's debts; she could have none under the existing law.

Here the money was not due, as we have seen, until 1871; and Chataing being then dead, and no legal representative appointed until recently before suit, no presumption of payment can arise. If the circumstances were different, however, I am inclined to believe the evidence here would repel the presumption. The obligations as we have seen were payable alone out of the money received from Venezuela, and I think it appears quite distinctly that they were not paid from this source. But it is unnecessary to pursue the subject.

Independently, however, of this defense (which goes to a part of the claim) the defendant says the verdict is too large, and this I think is true.

What should the plaintiff recover? Sympathizing with Idler's misfortune in his endeavors to realize on the judgment, the plaintiff has waived claim to a percentage of the one-third paid Mr. Whiton, an attorney, for services subsequent to the judgment. To ascertain the amount due we must take the sum paid in 1871, $17,696.98, and deducting one-third ($5,898.99) ascertain the amount due from the remainder, on the obligation of 1832, and after subtracting this, deduct the amount due on the obligation of 1833, $2,887.76. Thus we find what should have been paid on these obligations in 1871. Adding interest to the date of verdict, we have the amount due on that account at that date. Taking 10 per cent. of two-thirds of each subsequent payment and adding interest will, when added to the sum just stated, show the whole amount due from the defendant. The annexed table [2] is an illustration, and shows

| | | | |
|---|---|---|---|
| [2] 1871. | | | |
| June 21. | Administrator paid administrator...................................... $17,696 98 | | |
| | Less one-third.......................................................... 5,898 99 | | |
| | | $11,797 99 | |
| | 10 per cent. on................................................. $11,797 99 | $ 1,179 79 | |
| | Pesos.............................................................. $ 4,400 00 | | |
| | Less credits..................................................... 1,512 24 | 2,887 76 | |
| | | $ 4,067 55 | |
| | Interest on $4,067.55 from June 21, 1871, to October 18, 1893, verdict | 5,460 51 | $9,528 06 |
| 1876. | | | |
| May 16. | Amount paid administrator......................................... $20,224 57 | | |
| | Less one-third.......................................................... 6,741 52 | | |
| | | $13,483 05 | |
| | 10 per cent. on $13,483.05....................................... | $ 1,348 30 | |
| | Interest on same from May 16, 1876, to October 18, 1893................. | 1,408 97 | 1,757 27 |
| Oct. 15. | Amount paid............................................... $48,374 60 | | |
| | 10 per cent. thereof.................................... | $ 4,837 46 | |
| | Interest thereon from October 15, 1890, to October 18, 1893........... | 870 66 | 5,705 12 |
| 1892. | | | |
| Jan. 23. | Amount paid.............................................$20,330 64 | | |
| | 10 per cent. thereof................................. | $ 2,033 06 | |
| | Interest thereon from January 23, 1892, to October 18, 1893.......... | 213 46 | 2,246 52 |
| | | | $20,239 97 |

the sum due to be $20,239.97 being $7,432.33 short of the verdict. If the plaintiff will release this amount he can have judgment for the balance. Unless he does so, in writing, within 20 days from this date, a new trial will be granted.

The defendant thinks that as he received but one-third of the amount collected from Venezuela, he is liable (if at all) only on account of that sum. This is a mistake. The failure to receive more was the result of his voluntary act, and affects him and those with whom he acted alone. Shortly before the commission of 1868 assembled Idler's administrators entered into an agreement with his original associates defining their respective interests, and providing for a direct distribution to the several parties, of their shares of the money which might be collected. This agreement did not affect the rights of Chataing or his legal representative, under the obligations in suit. As respects that of 1832, as we have seen, Idler bound himself for 10 per cent. of what might be collected on the judgment. The obligation bound his associates, for whom he acted; but even if it did not, it bound him; and he could not escape this liability, or any part of it, by the voluntary agreement with his associates in 1888. As respects the second obligation, as we have seen, it bound Idler for 4,400 pesos to be paid from the first money collected on the claim which Idler was prosecuting, and this was represented by the judgment. The claim embraced the interest of Idler's associates as well as his own. The rights of Chataing under this obligation, as under the former, could not be affected by the agreement referred to.

Defendants bring error.

. Edward H. Weil and M. Hampton Todd, for plaintiffs in error.

Samuel F. Phillips, Frederic D. McKenney, and Henry R. Edmunds, for defendant in error.

Before SHIRAS, Circuit Justice, and ACHESON and DALLAS, Circuit Judges.

ACHESON, Circuit Judge. This was a suit brought on September 15, 1892, by Charles L. Borgmeyer, administrator of Alexander Chataing, deceased, against William Idler and John W. Hazeltine, administrators de bonis non of Jacob Idler, deceased. Alexander Chataing was a citizen of Venezuela, and a resident and merchant of the city of Caracas, where he died on August 20, 1836. Letters of administration upon his estate were granted to the plaintiff on September 14, 1892, the day before this action was commenced. Jacob Idler, who resided in Philadelphia, died there May 26, 1856. His widow administered on his estate, and upon her death, some 12 years later, letters of administration de bonis non, dated December 16, 1869, were granted to the defendants. The defendants settled administration accounts in the orphans' court of Philadelphia, and the moneys which had been received by them were distributed under the orders of that court. No claim on behalf of the estate of Alexander Chataing was ever made against Jacob Idler, nor was any such claim made against his personal representatives until the year 1892.

The plaintiff's statement of claim sets forth as grounds of action two instruments of writing (the originals of which are in the Spanish language), one dated September 25, 1832, and the other January 9, 1833. Before giving translations of these papers, it should be premised that, between the years 1817 and 1819, Jacob Idler, acting for himself and his associates in the enterprise (they all being citizens of the United States), furnished military supplies to

Venezuela. They claimed that a large balance was due them on that account. Disputes arose between that government and Idler, and the latter went to Venezuela about 1823, to effect a settlement. A prolonged litigation between the government and Idler in the courts of Venezuela ensued. On September 18, 1832, the juez de letras, the treasury court, an inferior tribunal, adjudged that the government was indebted to Idler in the sum of $70,520.11½. In this state of affairs, the first of the two above-mentioned writings was executed. The translation furnished us reads thus:

"[Seal. Fifth seal for the economic year 1832–1833; value, a real.]

"Be it known by this document, that I bind myself to pay to Senor Alexander Chataing, as well on my own account as upon that of my absent associates, a commission of ten per cent. upon the amount of the payment that I am claiming from the government of Venezuela on account of supplies that I made to the aforesaid government in the years 1817 to 1820, as soon as the payment or satisfaction is realized which the aforesaid government has to make me in virtue of a judgment of the Senor 'Juez de Letras' issued on the 18th of the current month. I declare that the aforesaid commission of ten per cent. has been well merited and gained by Senor Alexander Chataing, on account of the assistance that he has given me during the prolonged suit which he has pursued against the government, and on account of the numerous acts of diligence which he has performed to that purpose; and in conclusion, on account of the entire direction which he has given to the matter, although no publicly given power has authorized him, since he has discharged exactly, and with my consent in all details, the matter referred to, as an honest and careful attorney. For which reason I have given him the aforesaid commission of ten per cent. upon the whole amount that the government has to pay me; i. e., as well upon the principal as upon the interest that I claim from the state. I will make payment of the aforesaid commission of ten per cent. in the same way that the government makes it to me, that is to say, if it makes it to me by installments in metal I will pay the commission as well in metal by installments, in pro rata of the sum that I receive at each installment; and if the government makes me the payment in treasury notes or bonds for the whole amount, or whatever other nature in the same way I will make payment of the aforesaid commission in the same specie or form of treasury notes or bonds. I desire that this document shall have the same force as if it had been a public writing, and renounce all laws that could favor me; in virtue of which I sign the present document in the presence of three witnesses.

"Caracas, September 25, 1832.                    **Jacob Idler.**

"(The word 'ano' amended. Vale.)

"Witness: Franco Ribas.

"Witness: Jo. N. Zeresa.

"Witness: Cipriano Morales."

What particular services Mr. Chataing had rendered in procuring the judgment does not appear, and perhaps is a matter of no consequence. But in a letter dated Caracas, September 24, 1831, from Mr. Idler to Mr. Chataing, the former, after alluding to the protracted litigation in which he had been involved, and the mention of an appeal which the government had taken from a decision of Mr. Sprotto, a referee in the case, said:

"To avoid such an unjust loss to me and associates, who serve this government at a most critical epoch, I beg your assistance to obtain justice, knowing the great influence you have with the persons who can prolong or end this costly suit, as pr. liquidation of Mr. Sprotto, so just and clear. By so doing, I will allow you, for self and my associates, ten per cent. from the amount awarded and by the sentence, and, when received, to be paid to you in the same class of payments I receive of this government."

The translation of the other writing in suit reads thus:

"[Seal. Fifth seal for the economic year 1852–1853; value, two reals.]

"I, Colonel Andres Ybarra, principal registrar of the province, certify: That in the registry of public instruments kept by the Escribano Juan Antonio Hernandez, appears a writing of the following tenor:

"'Obligation: In the city of Caracas, on the ninth of January, 1833, before me, the escribano publico and witnesses, appeared Senor Jacob Idler, of this vicinity, and over twenty-five years of age, whom I certify that I know, and exhibited to me a ticket of the following tenor:

"'"Treasury General of Venezuela: Ticket No. 18:—January 9th, 1833: For 20 reals which Senor Alexander Chataing has paid, registry fee, due for 4,000 pesos which Senor Jacob Idler owes to him and promises to pay by a writing agreed to by himself before the Escribano Juan Antonio Hernandez: two pesos for reals:—(Copy of an entry made upon folio 2 of the memorandum book of this month.)

"'"Caracas, date as above.

"'"[Signed]                                   Lecuna Smith."

"'—As literally appears by the original which remains in the record office in my charge, which I refer to, and certify.

"'Whereupon he said: That he acknowledges that he owes to Senor Alexander Chataing, also a neighbor, and of the "comercio," the amount of 4,400 pesos, of eight reals of silver each, which in coined and current money of account to his satisfaction the latter has furnished him, since the 24th of September, 1831, for expenses of his subsistence, and costs of the prolix and expensive suit pursued against the government of Venezuela in compensation for supplies made in the years 1817, 1820, in virtue of a contract made for himself and absent associates, and, granting to him proper receipt with renunciation of the laws of delivery, exception of non numerata pecunia, proofs, etc., of the case, obliges himself to satisfy it executively, with costs, from the first funds that may be paid him by the government, his debtor,— with his person and estate, present and future, judicial power; submission to this in order that it may compel and constrain him executively to its fulfillment, as if it was by judgment given by consent and passed as a thing adjudged authoritatively, and making hereby renunciation of all laws, statutes and rights in his favor, although it may be one that may be propitious and afford a valid exception. The creditor, whom also I certify that I know, being informed of the literal contents of this writing, said that he accepts it according to law, and agrees to wait. Thus respectively have said, granted and signed,—Senores Luis Apesteguia, Manuel Galloso and Lorenzo Callett of this vicinity (being witnesses), Jacob Idler, Alex. Chataing:

"'Before me, Juan Antonio Hernandez, Escribano Publico.'"

The judgment of the juez de letras was affirmed by the superior court on October 1, 1832; and on December 6, 1832, the decision of the latter court was affirmed by the supreme court of justice. The Venezuelan government, however, refused to pay the judgment, or to recognize its validity; and in the year 1836 took steps in the supreme court of justice to have the judgment annulled by the allowance of the remedy of restitutio in integrum. The matter was then so proceeded in that on December 20, 1838, the superior court made a decision granting to the government the remedy of restitutio in integrum against the decisions of September 18 and October 1, 1832, and restoring the whole subject to the condition in which it was on August 31, 1830; and this judgment of the superior court was affirmed on February 22, 1839, by the supreme court of justice of Venezuela. The effect of this decision of the highest judicial tribunal of Venezuela was to set aside the judgment of the juez de letras of September 18, 1832, and to open up the whole controversy. No further proceedings with respect to the claim of Idler took

place in the courts of Venezuela. He and his association sought and obtained the friendly interposition of the United States in their behalf. Other citizens of the United States had claims against Venezuela. To all these claimants the government of the United States lent its good offices, and, as a result, a convention was concluded on April 25, 1866, between the United States and the republic of Venezuela for the adjustment of American claims upon the latter government. By the terms of this convention, a mixed commission, to sit at the city of Caracas, was created, consisting of two members, one appointed by each government, and an umpire chosen by the two commissioners, to whom all claims by citizens of the United States against Venezuela were to be submitted for final decision. "The commissioners," it was stipulated, "shall make such decision as they shall deem, in reference to such claims, conformable to justice, even though such decisions amount to an absolute denial of illegal pretensions, since the including of any such in this convention is not to be understood as working any prejudice in favor of any one, either as to principles of right or as to matters of fact." It was further stipulated that the commission should issue certificates for the sums to be paid claimants under its decisions, and that all such sums should be paid to the government of the United States.

Previously to the submission of the Idler claim to the mixed commission, and with a view thereto, Mrs. Idler, as administratrix of her deceased husband's estate, and her co-claimants, referred to William H. Whiton disputes which had long existed as to their respective interests in the claim; and it was agreed that, for his services in making the apportionment and in the preparation of the claim for presentation before the commission, Whiton should have one-third of the claim. Whiton performed these services, and the arrangement was carried out. The claim being submitted to the mixed commission, the two commissioners disagreed. The umpire, however, awarded to the claim the sum of $252,814. Nine certificates of equal amounts were issued therefor, three of which were delivered to the administrators of Idler's estate, three to their associates, and three to Whiton. Partial payments on account of these certificates were made by Venezuela to the United States; namely, on June 17, 1871, the sum of $17,696.98, and on May 16, 1876, the further sum of $20,255.12. The state department of the United States paid one-third of these sums to the administrators of Jacob Idler, one-third to their associates, and one-third to Whiton. No further payments were made on the award under the treaty of 1866.

On March 3, 1883, the president of the United States approved a joint resolution of congress providing for a new mixed commission in accordance with the terms of the treaty with Venezuela of April 25, 1866. That resolution, after reciting that serious charges affecting the validity and integrity of the proceedings of the former mixed commission had been made by the government of Venezuela, and also by divers citizens of the United States, who had presented claims for adjudication to that tribunal, requested the president to open diplomatic correspondence with Venezuela with a view to the

revival, of the general stipulations of the treaty of April 25, 1866, and the appointment thereunder of a new commission, and also provided that, from awards that might be made to claimants, any moneys theretofore paid upon certificates upon awards made by the former commission should be deducted, and such certificates deemed canceled. Accordingly, on December 5, 1885, a new treaty was concluded between the two governments, reviving the general stipulations of the former convention, adopting the provisions of the joint resolution of congress, and providing for a new mixed commission, composed of two commissioners and an umpire, whose decisions, or those of a majority of them, made "as they shall deem" to be "conformable to justice," should be final and conclusive. To this new mixed commission the Jacob Idler claim was presented, and a majority of the commission made the following award:

"Award of the Commissioners. July 14th, 1890.

"Claim of Jacob Idler vs. The United States of Venezuela. No. 2.

"The undersigned, commissioners appointed under the convention between the United States of America and the Unite 1 States of Venezuela, for the reopening of the claims of citizens of the United States against Venezuela, under the treaty of April 25, 1866, concluded at Washington, December 5, 1885, concurring in the decision herein, having duly heard the above claims, and considered the evidence and arguments of counsel pertaining thereto, do decide that there should be, and there is hereby, awarded against the government of the United States of Venezuela, in full satisfaction of the said claim, the sum of seventy thousand five hundred and twenty dollars ($70,520), gold coin of the United States of America, with interest thereon at the rate of six (6) per cent. per annum from October 1, 1832, to September 2, 1890, inclusive; amounting in all, after deducting the payments heretofore made on account of the former award, to the sum of two hundred and seventy-seven thousand six hundred and seventy-eight dollars and forty cents ($277,678.40), which sum is to be distributed, and certificates issued therefor, as follows: Ninety-two thousand five hundred and fifty-nine dollars and forty-six cents ($92,559.46) to William Idler and John W. Hazeltine, as administrators d. b. n. of Jacob Idler, deceased; thirty thousand eight hundred and fifty-three dollars and fifteen cents ($30,853.15) to Frederick J. Whiton; ninety-two thousand five hundred and fifty-nine dollars and forty-seven cents ($92,559.47) to Henry L. Bogert, trustee; thirty thousand eight hundred and fifty-three dollars and sixteen cents ($30,853.16) to Mary L. Russell, and thirty thousand eight hundred and fifty-three dollars and sixteen cents ($30,853.16) to Crammond Kennedy.                        John Little,
                                    "John V. L. Findlay,
                                        "Commissioners."

Upon the trial in the circuit court, the defendants submitted the following point with respect to the 10 per cent. commission payable to Chataing under the paper of September 25, 1832:

"Fifth. The payments agreed to be made to Alexander Chataing for his services, as set forth in Exhibit B of plaintiff's statement, were contingent on Jacob Idler's recovering satisfaction for his judgment against the government of Venezuela in said Exhibit B, referred to.

This point the court below affirmed. Other points relating to the same matter were submitted by the defendants, and were reserved by the court. We will quote several of these reserved points as indicative of them all:

"Fourth. The construction of the contract for compensation is for the court. It was not in contemplation of the parties to the contract that Chataing should receive compensation for an award made by the international tribunal many

years after his death, presented and prosecuted by other agents and attorneys. Venezuela having declined and refused payment, there can be no recovery based on an award made in Caracas in 1868, or in Washington in 1890, and the verdict must therefore, under all the evidence, be for the defendant."

"Sixth. The undisputed evidence in the case is that no payments have been made by the government of Venezuela on account of the judgment rendered against it, and which is set forth in said Exhibit B of plaintiff's statement, and therefore the verdict should be for the defendant."

"Ninth. The award in favor of Idler and his associates was made by an international commission, administering justice and equity for the supplies, etc., furnished by them to that government, and was a sentence or award after full examination of the merits of the claim, irrespective of the original sentence of the Venezuelan court.

"Tenth. By the decree of restitutio in integrum, the judgment in favor of Idler and his associates was annulled in Venezuela. More than fifty years afterwards, an international tribunal made an award to these parties, and the moneys they received were based upon that award, and there can be no recovery in this suit."

Eventually the court below decided the reserved points against the defendants, and entered judgment against them.

As is to be seen from its affirmance of the defendants' fifth point, the circuit court rightly considered that the payment to Alexander Chataing of the stipulated commission was contingent upon Jacob Idler's recovering satisfaction of the judgment he had obtained on September 18, 1832, against the government of Venezuela. Evidently, Idler and Chataing dealt with respect to that judgment. It, indeed, was the very basis of Idler's undertaking to pay the commission. Undoubtedly, they contemplated the voluntary payment of the judgment by Venezuela, and this within a reasonable period. Idler was to pay the commission in the same way that the government made the payment to him and at the same times. Was satisfaction of the judgment, within the fair meaning of the paper of September 25, 1832, ever realized? The circuit court was of the opinion that substantially the money was collected on the judgment, the court saying: "The money collected must be regarded as realized on the judgment; the fruits of its execution by the government of the United States." In this view we are not able to concur. The United States never undertook to enforce the payment of the judgment. From first to last, its action in this matter was strictly diplomatic and peaceful. It merely exercised in a friendly manner its good offices on behalf of Idler and his coclaimants. Had it gone beyond this, it would have violated its settled policy with respect to claims of its citizens founded on their contracts with foreign governments. Whart. Int. Law, § 231. Moreover, the judgment of September 18, 1832, was absolutely annulled. The decision of the supreme court of justice of Venezuela is conclusive upon that point. It must be observed that the final judgment of that tribunal in the litigation with Idler did not affect his contractual rights, but left them in full force. The decision was merely that the remedy of restitutio in integrum was open to the government, and was applicable to Idler's case, and that the action of the superior court in granting that remedy, and thus reopening the case, was right. Could Alexander Chataing, a citizen of Venezuela, or those claiming under him, challenge, anywhere, the binding force of the judgment thus pro-

nounced by the highest court of his own country? Surely, the courts of this country are to respect that judgment. Elmendorf v. Taylor, 10 Wheat. 152, 159; Smith v. Condry, 1 How. 28.

Idler's judgment having thus been swept away, the consideration for his promise to pay to Chataing a commission thereon wholly failed. The event upon which the commission was to be paid never occurred. Very certain is it that nothing was paid by Venezuela to Idler or to his personal representatives on the footing of the judgment. To apply, then, the writing of September 25, 1832, to the state of affairs brought about more than half a century afterwards by the award made by a mixed commission, acting under an international treaty, would be a perversion of the paper, and would work the greatest injustice to the estate of Idler. The whole situation had radically changed without his fault. His judgment had utterly failed him. The allowance of the claim was ultimately secured by the action of an independent tribunal, proceeding upon original grounds. The favorable result was due to the long-continued personal exertions of Idler and his associates, and the services, at a vast expense, of other agents and attorneys. All this the evidence shows. To the result neither Chataing nor his personal representatives contributed aught.

We do not consider it a matter of any moment that, in pressing their claim before the mixed commissions, Idler's administrators relied upon the Venezuelan judgment of 1832. That judgment was a part of the complicated transactions between their intestate and the government of Venezuela. It, perhaps, afforded some evidence of the correct amount of the indebtedness in dispute. Nor is it important how the majority of the commissioners may have regarded that judgment. Neither its correctness nor its existence was recognized by either of the treaties. The mixed commissions were to decide with reference to the merits of all claims submitted to them. The opinion filed on behalf of the majority of the last commission shows that the Idler claim was investigated and sustained by them upon its original merits. They were at liberty, had the facts so warranted, to have found against the claim altogether. That they awarded the face amount of the judgment with interest is of no consequence. The reasons for their award are immaterial here. The important fact is that whatever moneys Venezuela paid on the Idler claim were paid on the awards of the mixed commissions, and not otherwise. Construing the paper of September 25, 1832, with reference to its terms, its subject-matter, and the situation of the parties, we conclude that no payment or satisfaction of the judgment therein recited was ever made or realized within the true intent of the parties, and that the stipulated commission to Chataing never became payable. It follows, therefore, that the reserved questions of law appertaining to this branch of the case should have been decided in favor of the defendants.

To the plaintiff's demand upon the other instrument in suit,— the paper of January 9, 1833,—three defenses were set up, namely: First, payment in fact; second, the statute of limitations; third, the presumption of payment arising from the lapse of 20 years. Un-

der the first head, uncontradicted evidence of a persuasive character was produced to show that this indebtedness was entirely discharged in the lifetime of Alexander Chataing. By a writing dated Caracas, May 15, 1833, Chataing receipted for certain accounts due to Idler, amounting to $1,051.65, left with him for collection, and a small amount of personal property to be sold, on Idler's account. In a letter dated Caracas, June 6, 1834, and addressed to Idler at Philadelphia, Chataing acknowledged payment by Idler of $1,071.68 on this debt. Other correspondence shows that at different times Idler shipped merchandise to Chataing upon his orders. It is admitted that this correspondence, on its face, shows Idler to be entitled to an additional credit of $440.56. William Idler, a son of Jacob, testified that, to his personal knowledge, his father made other shipments of goods to Chataing; that "there were a great many shipments made"; that Chataing paid nothing on those shipments; that, while not able to state the exact amount of the shipments, he always believed that the whole debt of 4,400 pesos had been paid; that many of his father's books and papers had been lost or destroyed. Having regard to the antiquity of these transactions, the evidence of actual payment strikes us as remarkably full. It is to be considered in connection with the significant fact that no assertion of such indebtedness was made by the personal representatives of Alexander Chataing until the year 1892. This nonclaim for a period considerably more than 50 years is inexplicable, except upon the hypothesis of full satisfaction in the lifetime of Chataing.

To hold that the debt of 4,400 pesos was payable only out of money to be received by Idler from the government of Venezuela, we think, would be to give a false effect to the paper of January 9, 1833. That writing did not create any debt, but was a formal acknowledgment before the escribano publico of a previously existing indebtedness. The paper, it seems to us, must be regarded as a collateral obligation. That this is a correct view is evinced by the subsequent acts of the parties. Thus regarding the transaction, we can understand how it happened that Idler made payments to Chataing on account of the debt. Is it to be supposed that the parties intended that Chataing was not to be paid at all if the government of Venezuela never paid Idler? That conclusion would contravene the plainest principles of justice. True, the writing states that Chataing "accepts it according to law, and agrees to wait." But how long was he to wait? Was he to forbear forever? Can it be that Chataing had so bound himself that no proceedings could be had upon his original and principal cause of action, notwithstanding the refusal of Venezuela to pay Idler and the action of the court in vacating Idler's judgment? We think not. The utmost effect that can justly be attributed to Chataing's agreement to wait is that he was to allow Idler a reasonable time for the collection of the money which the government owed him. Whether the statute of limitations commenced to run in the lifetime of Chataing we need not decide. We are entirely satisfied, however, that the presumption of payment which arises after the lapse of 20 years applies here. That presumption is applicable to every species of security for the payment of

money, whether bond, mortgage, judgment, or recognizance,—to
debts of all descriptions not barred by the statute of limitations; and,
until the presumption is rebutted, the instrument does not furnish
even prima facie evidence of indebtedness.   Van Loon v. Smith,
103 Pa. St. 238; Lash v. Von Neida, 109 Pa. St. 207;  Biddle v. Bank,
Id. 349.

Now, it is satisfactorily shown that by the law of Venezuela, at
all times, the heir, whether under a will or ab intestato, is consid-
ered to be the same person as the deceased, and succeeds the de-
ceased directly, in all his rights and title in and to the property,
whether real or personal, which forms the estate, from the very mo-
ment of the death, and is invested with the right to demand, sue
for, collect, and recover all claims and debts due to the deceased.
This so appears from the affidavit (taken, by agreement, with the
same effect as a deposition under a rule of court) of Jose Ignacio
Rodriguez, a doctor of civil law, etc.   This affidavit, while taken
after the trial before the jury, was for use before the court upon the
hearing of the rule for judgment upon the questions of law reserved,
and is therefore to be treated as part of the record, at least so far as
concerns the reserved questions of law; and the reservation of the
defendants' twelfth point covers the question now under discussion.

The law of Venezuela, then, being as stated, it follows that the
heirs of Alexander Chataing had the right to demand and receive
payment of the debt of 4,400 pesos mentioned in the paper of Jan-
uary 9, 1833, if any part of it remained unpaid.   Therefore, the
presumption of payment is operative here, although no adminis-
trator had been appointed in the state of Pennsylvania.   Adminis-
tration was, indeed, necessary in order to maintain a suit in the state
of Pennsylvania, but not at all for the purpose of the receipt and ac-
quittance of this debt; and the presumption of payment applies
and should be enforced.   Foulk v. Brown, 2 Watts, 209, 215, 217.
There a suit was brought in the year 1829 by Lewis Foulk, admin-
istrator of Isabella Foulk, his deceased wife, against the executor
of William Brown, deceased, to recover a legacy bequeathed to
Isabella.   The testator died in 1802, and Isabella Foulk in 1804.
The presumption of payment arising from the lapse of 20 years was
set up against the plaintiff.   To meet this defense he set up the
want of administration, but without avail.   The court said:

"Now, although it is true that, in order to sustain a suit for this legacy
after his wife's death, the plaintiff would have been obliged to take out let-
ters of administration, yet that was a ceremony at all times in his own
power to resort to.  He had but to ask, and would have received them as
a matter of course.  His disability to sue was a voluntary one.  How, then,
can he set up his own laches and indolence in this respect?  Or how does it
show that he was not paid?"

The point of this decision was that as the plaintiff, as surviving
husband, had acquired the right to the legacy, the presumption of
payment arose, even in the absence of administration.   The princi-
ple applies here; and the following observations of the supreme
court of Pennsylvania made in that case are very pertinent:

"The rule of presumption, when traced to its foundation, is a rule of con-
venience and policy, the result of a necessary regard to the peace and se-

curity of society. No person ought to be permitted to lie by whilst transactions can be fairly investigated and justly determined until time has involved them in uncertainty and obscurity, and then ask for an inquiry. Justice cannot be satisfactorily done when parties and witnesses are dead, vouchers lost or thrown away, and a new generation has appeared on the stage of life, unacquainted with the affairs of a past age, and often regardless of them."

We entertain no manner of doubt that, at least as early as the decision of the supreme court of justice of Venezuela affirming the vacation of Idler's judgment, the heirs of Alexander Chataing had the right to demand payment of the balance, if any, of the debt of 4,400 pesos. But, even upon the plaintiff's view, the presumption of payment had closed against the debt before this suit was brought; for in the year 1871 the defendants received, out of moneys paid by Venezuela on the Idler claim, a sum in excess of the debt.

Upon the whole record, we are of the opinion that the court below should have entered judgment for the defendants on the reserved points; and following the practice laid down in Insurance Cos. v. Boykin, 12 Wall. 433, we will enter the judgment which that court ought to have rendered.

The judgment of the circuit court is reversed; and it is ordered that judgment be entered in favor of the defendants below (the plaintiffs in error) upon the questions of law reserved non obstante veredicto.

### NOTE.

The following are the opinions of Messrs. Talmage and Machado, Jr., referred to on page 915, ante:

Opinion of the United States Commissioner upon the Claim of Jacob Idler, Deceased (Sophia Idler, Administratrix; William Idler, Attorney. No. 1, as per Secretary's List), Submitted to the Umpire, as per Minutes of July 18th, 1868.

The undersigned, David M. Talmage, commissioner of the United States of America upon the mixed commission celebrated between the United States of America and the republic of Venezuela, April 26th, 1866, admits the said claim for the full amount as presented before this commission, the same being founded in justice, and upon which claim the legal tribunals of Venezuela uniformly, in every stage of Mr. Idler's suit before them, decided that the government of Venezuela was bound to pay him the amount claimed, as will fully appear by reference to data following, to wit:

By a reference to the expediente containing all the proceedings had and made in Mr. Idler's case before these authorities, it appears: First, that, in the year 1817, Gen'l Bolivar, then the acknowledged supreme civil and military chief of Venezuela, forwarded to Gen'l Lino De Clemente, at the time residing in the city of Philadelphia, in the United States, a commission as agent of Venezuela, with powers full and ample to make and negotiate for supplies or otherwise, of whatever nature or kind (which, in said commission is acknowledged as obligatory and binding in the most sacred manner upon the government of Venezuela), and, in the case of his (Clemente's) death or absence, then the same power and authority to devolve on Pedro Gual, at that time residing likewise in Philadelphia, under which power and authority and pledge so given General Lino De Clemente did enter into certain contracts for supplies therein named with Jacob Idler and associates. That subsequently Gen'l Lino De Clemente left the United States, substituting by authority Manuel Torres as the agent of Venezuela, with the same powers in all matters of negotiation, contracts, and supplies which had been previously given to and exercised by Gen'l Clemente, with the same preferences and pledges of the government of Venezuela, and with whom the said Idler continued his contracts and supplies up to the year 1821. It would

appear that the agents of Venezuela, General Clemente and Manuel Torres, under the powers of their commission (diploma) and instructions attached to the same, did pledge all and singular the guaranties therein offered by the supreme civil and military chief, to wit, Barinas tobacco, cacas, coffee, indigo,—in fact every production of the country,—together with the privilege of discounting in payment in full all duties on imports and exports made by the contractors, under which guaranties the said Idler and associates entered into the contracts with the agents of Venezuela, but which in various settlements made were withheld (particularly the Barinas tobacco, which was exclusively the property of the government), under various pretexts, from the said Idler and associates, and that, too, after the most sacred pledges given by the supreme chief, in the most trying, and, I may say with truth, the most eventful, period of the revolution. The agents of Mr. Jacob Idler and associates then residing in Venezuela, not having liquidated or settled in full the contracts made by them, induced them to send out a special agent from the United States, in the person of Mr. William Duane, to adjust the balances and close the same, not doubting but an immediate arrangement would be made to liquidate and adjust the claims of the said Idler and associates against the government of Venezuela. In this it appears that he did not succeed. Another was sent out, and he did not succeed. Mr. Idler, therefore, as principal, concluded to leave his large and helpless family of children, and embark for Venezuela, that he might in person attempt the adjustment himself. He therefore presents himself before the authorities of Venezuela, and under a liquidation previously made in the office of the intendency, acknowledged by the intendant, makes out his claim, admitted to proof by Gen. Lino De Clemente, who declares the contracts made by himself and Manuel Torres under the powers given by the supreme chief, General Bolivar, were concluded in their terms without the supervision of any other authority, and which contract should be paid in preference to all others, pledging the crop or crops of Barinas tobacco, and, if not in that, in hard dollars." In this state, and upon the admitted and liquidated account of the intendant, Gen. Escalona, Mr. Idler brings his case before the then intendant, Mendoza, who, by his decree of the 28th of May, 1828, and signed by his assessor, Castillo, refers the whole matter in dispute between Mr. Idler and the government of Venezuela "to arbitrators," and for this purpose named Elias Mocatta and Vicente Aramburn, both of whom declined, from a want of time to attend to the same. In the meanwhile, Gen. Briceno had been named intendant, who excused the previous arbitrators, and nominated, with the consent of his assessor, Duarte, Jose M. Rojas, and Francisco Amaritique in this place. In this situation, a discordia takes place with the treasury; and Mr. Idler, through his attorney, asks that in case a disagreement should occur in the adjustment of the accounts and claims of said Idler with and upon the treasury, that he should be privileged to nominate a third person to examine entirely and thoroughly all and every account, contract, contract payments, liquidations, or settlements; and for this purpose Mr. G. B. Sprotto was named, a respectable and intelligent merchant, and well known as such to the authorities. The nomination was acceded to by the intendant, Mr. Lecuna, and the assessor, Duarte, and the same admitted by the treasurers, Lecuna and Smith. Mr. Sprotto accordingly examined the accounts entire, from beginning to end, and finally rendered a balance against the government of Venezuela, in favor of Mr. Idler, of $72,346.34, which is confirmed in an able and lucid illustration of the case by the fiscal, lawyer, the legal defender of the rights of the state, in which situation the case goes before the judge of letters of the treasury, juez letrado de hacienda, who in a very distinguished and able manner argues the case, and confirms the liquidation made by Sprotto and the decision of the fiscal, and refers the matter in consultation (consulta) to the superior court of justice, allowing both parties, the state and Mr. Idler, the legal time for taking an appeal. In consultation, the superior court revoked the sentence, not on the justice or principle of the case, but on the grounds of some errors having been made in the liquidation in debit and credit made by Mr. Sprotto, and that the general treasury, with the knowledge of Mr. Idler, should nominate another person to examine into the settlement made by Mr. Sprotto, who was about absenting himself from the country. The supreme court, in the appeal of Nulidad

(recurso de Nulidad) had in this state of the case, refers the case back again to the superior court, who finally, by their decree, nominate Juan Silva to examine the statement made by Sprotto. Mr. Idler accuses Mr. Silva. The superior court admits the accusation, and nominates thereafter Jose Ventura Santana for the same purpose, who accepts the same, but subsequently renounces the appointment, which is admitted by the court. The supreme court then nominates John Cadenas, who accepts, and after a most minute and laborious examination into every account and contract and settlement made one by one, and the general liquidation made by Mr. Sprotto, and the objections to the same made by the treasury, in a most able, intelligent, and independent manner, decides and estabishes, "by the documents in the liquidation," that the government of Venezuela is indebted to Mr. Jacob Idler in the sum of $70,520.11½, "hard dollars," with interest from the 30th June, 1825, until paid. The attorney general of the state (the fiscal) asserts and confirms this liquidation, and the judge of letters of the treasury (juez letrado de hacienda) confirms it as follows: "Que los fondos publicos sen responsable al Senor Jacob Idler de la citada cantidad de setenta mil quimentos pesos dice y medio centavos fuertes que seran satisfechos en el modo v terminos que dispenga el supremo gobierno a quien ocani el interesado con testimonio que se ie dara delo que sea conducento a la classificacion del ededito y order de pago; consultase antes esta determinacion con su excelencia la coste suprema de justicia remitiendosele al ejecto les antos originales, y satisfaciendo el Senor Idler, todas las costas causadas y que causaren."

This decision, as above, is referred in consultation to the superior court, who confirms that decision of the judge of letters (juez letrado de hacienda). The documents are again produced to the juez letrado de hacienda, who, according to his previous decree and the approval of the superior court as above in consultation, and the sanction of the attorney general (fiscal), orders the execution of said sentence.

Mr. Jacob Idler, in this state of his business, having established clearly and unequivocally his claims by the laws of Venezuela, appeals to his excellency, the president, for the payment of the amount adjudicated to be due to him by the courts of the country, to which he is answered by the secretary of exterior relations and secretary of hacienda: (1) That the judge of letters of the treasury (juez letrado de hacienda) had no power in the case; (2) that the contracts were made by agents of the executive; (3) that in controversies of this kind the supreme court of justice could only take cognizance of the case, according to article 147, attribution 5, of the constitution, and disowns the authority of the judge of letters of the treasury (juez letrado de hacienda) to declare Mr. Jacob Idler a creditor of the state, for reasons of the contracts, and resolving that the government will take notice, hear, and examine the accounts when the divisions that heretobefore composed Colombia shall take into consideration the public debt, etc. In this situation the case is again brought before the attorney general (fiscal), who clearly establishes by argument and law his power and authority as such constitutionally and legally, and the nullity of the opinions of the secretary of exterior relations and treasury in all cases in which the state is interested, which is confirmed by the supreme court, and again confirmed by the judge of letters of the treasury (juez letrado de hacienda) that the government of Venezuela was indebted to Mr. Idler in the sum reported to be due by Mr. Jose Cadenas of $70,520.11½, hard dollars, with interest from the 30th June, 1825, until paid. When these decisions are brought again before the secretary of exterior relations and treasury, the case is referred in consultation with the council of government (consultase el consejo de gobierno). The council of government, after the decisions of all the courts of justice, and admitting the lawsuit of Mr. Idler by the authorities of the government in such cases, and defending it through all its stages with a most determined hostility, creating heavy expenses, opposing the claim of Mr. Idler at every step, and by all means which persons in authority can use against a private individual, but which, fortunately for Mr. Idler, he sustained in a most triumphant manner, and at every step gains decisions after decisions in his favor, both by the authorities appointed in such cases to overlook and defend the rights of the state, as well as the legal and independent courts of the coun-

try, until finally an appeal is made to the executive for payment of his established claim, when he declares, in consultation with the council of government: "Por las razones y fundamentis legales de la precedente consulta de consejo de gobierno se declare que mo ha lugar a la solicitud de Jacob Idler. Por S. E., El Presidente de la Republico Michelena." Mr. Idler again makes a memorial to his excellency, the president, the 18th December, 1832, asking payment for the sum adjudicated to be due him, and handing a decree of supreme court in the case of Vicente Michelena, Brothers Michelena & Co., claiming payment of Venezuela (not Colombia) for a bill of exchange drawn by the government of Colombia in favor of Mr. Idler, and indorsed by him to the Michelenas, which is ordered by the attorney general (fiscal) to be paid (and confirmed by the supreme court) by the government of Venezuela, and which was accordingly paid. Mr. Jacob Idler again memorializes his excellency, the president, in two instances, without receiving an answer. The attorney general (the fiscal) then presents the case to his excellency, the president, and asks its adjustment and reference to the supreme court (according to the opinion of the secretary of exterior relations and treasury), who declare that, having once decided the case, and admitted and adjudged on the justice of the claim of Mr. Idler, it is therefore concluded legally and definitely by the tribunal.

By all of which facts above recited, "to be found upon the pages [indicated] in the expediente," it is clearly proven by the decisions of all the courts of Venezuela that the said claim of Jacob Idler is established and admitted, and has been due and owing to the said Idler "by the government of Venezuela" since June 30, 1825; and the undersigned can only be astonished how any equivocation could arise in its adjustment by these authorities, and how the payment should have been evaded and resisted to this late day.

In all civilized countries (especially republican in form) the decisions of the legal tribunals are respected and obligatory, not only upon the citizen but the government. However, it appears that here, under a written constitution, under admitted rights of equality and justice, the decisions of the courts of justice ("the highest tribunals" known) are subject to nullity by a power which I cannot conceive given or granted in any part of the constitution or laws to a co-ordinate part of the government. To acknowledge the existence of such a power would in its effects control and subvert the liberty of freedom and justice. There is no power reposing in the government of Venezuela competent to declare the decisions of its highest tribunals illegal, much less to deny to a citizen of the United States his rights under and by virtue of such decisions and the mandates of international law. The claim of Jacob Idler has all the authority and sanction of law for its support, notwithstanding which he is denied even that sympathy which a struggling nation owes for the supplies furnished by him in the hour of her direst extremity, and but for which she might never have achieved her independence.

It should be observed in this connection that there is a strange contradistinction connected with the case of Mr. Idler and the parallel one of Vicente Michelena, for Brothers Michelena & Co., referred to above. The final decision of the tribunals in this case of Idler—but denied by Mr. Santos Michelena, secretary of hacienda (treasury), one of the firm of Michelena Brothers—is the ground on which Vicente Michelena, as aforesaid, brings an action against Venezuela to pay a bill of exchange drawn by the government of Colombia on England in favor of Mr. Idler, and indorsed by Santos Michelena, which bill was returned protested, and which, according to the memorial of Vicente Michelena, has been paid in full, with all the damages and costs, by Venezuela, and that, too, after the said Santos Michelena had declared, as secretary of the treasury (hacienda), Mr. Idler should wait a settlement of the affairs between the separate parts of Colombia before his claim could be adjusted. I forbear to make any remark on this affair, leaving it to Venezuelan authorities to reconcile, if they can, the justice of this settlement with the Michelenas with the refusal of justice to an actual parallel in the case of Mr. Idler.

It has been attempted to palliate the evasion and resistance of Venezuela to the payment of this just claim with the old "subterfuge" of "restitutio in integrum" against verdicts rendered, without remembering that that

Venezuela Republican Code, from its birth, abolished all the laws and practice of the old regime which were at variance with the spirit of legal equality which constitutes the basis of her institutions, and that, as a consequence, "the laws specially applicable to judicial proceedings in Venezuela have always, since the emancipation of the republic, laid down the prohibition of opening judicial lapses after their fulfillment, through restitution or any other motive whatsoever; that, in accordance with the fundamental principles of the republic, the Civil Code does not admit of recourse to restitution or nullification of acts of minors or incapables where the necessary formalities for their validity have been observed"; and, finally, that, by an appeal to that method of restitution, the dignity of both the courts and the state is assailed, by supposing that a nation able to bring to a happy conclusion the gigantic struggle for its independence has become so weak and imbecile, incapable of defending itself in a civil suit before its own magistrates.

Again, Mr. Idler's contracts having been arranged and executed with the agent of Venezuela in the United States, it would be a violation of the principles of international law to pretend or to contend that special privileges never known in North American jurisprudence should be brought to bear in the questions which have arisen from these contracts, and it must be borne in mind that it would be against the principles of the "Rights of Nations" to oblige Idler (who was not only a stranger in Venezuela, but who never acquired any sort of residence therein) to follow up in said country suits of restitution or of any other kind in which it were intended that he should act the part of defendant.

Further, this indebtedness was contracted by Venezuela solely, previous to her confederation with Colombia, and for a period of eight years subjected to the liquidations and decisions of her own tribunals, etc., and by them definitely determined, and consequently could not by any possible legal construction or color of justice be considered within the promise of or subject to the jurisdiction of any commission growing out of the subsequent confederation or conventions or treaty stipulations as between the parties to such confederation, and such the decision at one time of the government of Venezuela herself, considering it her pleasure and sole privilege to contest and conclude this matter with Idler. All action on the part of Venezuela since 1833 (when this case was declared by the highest tribunals finally determined and concluded) in evading and resisting payment to Idler is mere subterfuge, and the means resorted to not only illegal (by its own constitution), but without precedents in jurisprudence, and cannot be recognized or considered by the undersigned, save to ignore and condemn the same as unworthy the resort of an individual, much less a government founded upon the broad basis of equality and justice, and assuming to administer the same.

In view of all the facts of the case, and the final judgment and decision (afore referred to) of the highest tribunals known in the land, is established beyond controversy or appeal the irrevocable right acquired by Idler to be recognized as a creditor of Venezuela for the full amount of his claim; and, in accord therewith, I do adjudge and determine the heirs of Jacob Idler, deceased, entitled to the sum of three hundred and twenty-five thousand six hundred and twenty-five 54/100 hard dollars, as an award made in adjustment of said claim of heirs of Jacob Idler, deceased, and justly owing and to be paid by the government of Venezuela, as per my rendering subjoined:

Amount of final liquidation, with interest to date of confirmation of same by the sentence of the supreme court, October 30, 1833 ........................ $105,780 17

Add interest on above amount at rate of six per cent. per annum, from October 30, 1833, to date, June 20, 1868 ................................... 219,845 37

Sum total ......................................................... $325,625 54

The above amount now due the heirs of Jacob Idler, deceased, by the government of Venezuela, S. A.

[Signed] David M. Talmage, United States Commissioner.
Alfred Alderson, Secretary of Mixed Commission.

Decision of the Umpire upon the Claim of Heirs of Jacob Idler.

No. 1.

(Translation.)

Gentlemen of the Mixed Commission of the U. S. of Venezuela and N. America:

Caracas, August 1st, 1868.

The Idler claim being submitted to me as umpire, on account of the difference of opinions that has arisen between the commissioners, I have examined all the papers relating to it, and it is with the fear of committing an error that I proceed to give my opinion on this delicate question, and to pronounce the verdict required of me.

I shall not enter into the history of the lengthy course through which this affair has run, the origin of which goes back as far as 1817, in which year the liberator authorized Genl. Clemente to contract in North America for the supply of war materials wherewith to uphold the independence of Venezuela. One of the North American contractors, Jacob Idler, carried into effect an extensive contract of these articles of war; and it is a fact that the tribunals of the republic, by verdicts given on the 18th of September and the 1st December, 1832, acknowledged Idler to be a creditor of the state for seventy thousand five hundred and twenty dollars eleven and a half cents. These verdicts having been argued upon as null, they were reconsidered by the supreme court, which repelled the invalidity attempted to be shown, and by its verdict of the 6th of December, 1833, declared the suit to be completely concluded and done with. The executive government of Venezuela thought that the tribunals of the republic had acted with precipitancy, without a detailed acquaintance of the facts and transactions in question, and, through its influence, prevailed upon the supreme court to order the restitution in integrum regarding the matter, taking for its authority an old Spanish law (1 P. tit. 19, Partida 6), which puts the state on the same footing as a minor, for the purpose of by these means obtaining the revision of those final decisions. The North American legation invariably opposed itself to such proceeding, and considers the suit as completely concluded.

The undersigned considering (1) that the bringing back these questions to the state they were in previous to the courts of Venezuela taking cognizance of them would necessitate anew a strict settlement of the respective claims, thus incurring serious difficulties arising from the antiquity of those transactions and accounts which would have to be examined; (2) that this appeal to restitution (to which the government of Venezuela has manifested a dislike), if it was not undivested of some support in law, has at least become so unpopular as to have fallen into its present state of explicit reprobation; (3) that the convention of the 25th of April, 1866, opens the way to an equitable decision, which can reconcile conflicting pretensions as far as possible,—I judge and decide that the before mentioned $70,520.11½, hard dollars, be acknowledged in favor of the heirs of Jacob Idler, and, moreover, one hundred and eighty-two thousand two hundred and ninety-four hard dollars as interest; the amount of the claim being two hundred and fifty-two thousand eight hundred and fourteen hard dollars. So I decide.

I am your obedient servant,

[Signed]              J. N. Machado, Jr.

Alfred Alderson, Secretary Mixed Commission.